# UNITED STATES ET AL. *v.* STORER BROADCASTING CO.

No. 94.　Argued February 28–29, 1956.—Decided May 21, 1956.

*Warren E. Baker* argued the cause for petitioners. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Barnes, Ralph S. Spritzer, Daniel M. Friedman, J. Smith Henley, Richard A. Solomon* and *Daniel E. Ohlbaum.*

*Albert R. Connelly* argued the cause for respondent. With him on the brief were *Thomas H. Wall, John E. McCoy* and *John D. Calhoun.*

MR. JUSTICE REED delivered the opinion of the Court.

The Federal Communications Commission issued, on August 19, 1948, a notice of proposed rulemaking under the authority of 47 U. S. C. §§ 303 (r), 311, 313 and 314 (Communications Act of 1934, as amended, 47 U. S. C. § 301 *et seq.*). It was proposed, so far as is pertinent to this case, to amend Rules 3.35, 3.240 and 3.636 relating to Multiple Ownership of standard, FM and television broadcast stations. Those rules provide that licenses for broadcasting stations will not be granted if the applicant, directly or indirectly, has an interest in other stations beyond a limited number. The purpose of the limitations is to avoid overconcentration of broadcasting facilities.

As required by 5 U. S. C. § 1003 (b), the notice permitted "interested" parties to file statements or briefs. Such parties might also intervene in appeals. 47 U. S. C. § 402 (d) and (e). Respondent, licensee of a number of radio and television stations, filed a statement objecting to the proposed changes, as did other interested broad-

casters. Respondent based its objections largely on the fact that the proposed rules did not allow one person to hold as many FM and television stations as standard stations. Storer argued that such limitations might cause irreparable financial damage to owners of standard stations if an obsolescent standard station could not be augmented by FM and television facilities.

In November 1953 the Commission entered an order amending the Rules in question without significant changes from the proposed forms.[1] A review was sought

[1] Section 3.636 will illustrate the problem:

"§ 3.636 *Multiple ownership.* (a) No license for a television broadcast station shall be granted to any party (including all parties under common control) if:

"(1) Such party directly or indirectly owns, operates, or controls another television broadcast station which serves substantially the same area; or

"(2) Such party, or any stockholder, officer or director of such party, directly or indirectly owns, operates, controls, or has any interest in, or is an officer or director of any other television broadcast station if the grant of such license would result in a concentration of control of television broadcasting in a manner inconsistent with public interest, convenience, or necessity. In determining whether there is such a concentration of control, consideration will be given to the facts of each case with particular reference to such factors as the size, extent and location of areas served, the number of people served, and the extent of other competitive service to the areas in question. *The Commission, however, will in any event consider that there would be such a concentration of control contrary to the public interest, convenience or necessity for any party or any of its stockholders, officers or directors to have a direct or indirect interest in, or be stockholders, officers, or directors of, more than five television broadcast stations."* *   (The italicized material is common to all three Rules.)

* "In applying the provisions of paragraph (a) of this section to the stockholders of a corporation which has more than 50 voting stockholders, only those stockholders need be considered who are officers or directors or who directly or indirectly own 1 per cent or more of the outstanding voting stock." 47 CFR, Rev. 1953.

The standard and FM Rules limited stations to seven.

in due course by respondent in the Court of Appeals for the District of Columbia Circuit under 5 U. S. C. § 1034,[2] 47 U. S. C. § 402 (a),[3] and 5 U. S. C. § 1009 (a), (c).[4] Respondent alleged it owned or controlled, within the meaning of the Multiple Ownership Rules, seven standard radio, five FM radio and five television broadcast stations. It asserted that the Rules complained of were in conflict with the statutory mandates that applicants should be granted licenses if the public interest would be served and that applicants must have a hearing before denial of an application. 47 U. S. C. § 309 (a) and (b).[5]

---

[2] "Any party aggrieved by a final order reviewable under this chapter may, within sixty days after entry of such order, file in the court of appeals, wherein the venue as prescribed by section 1033 of this title lies, a petition to review such order. . . ."

[3] "(a) Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 19A of Title 5."

[4] "Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion—

"(a) Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.

.        .        .        .        .

"(c) Every agency action made reviewable by statute and every final agency action for which there is no other adequate remedy in any court shall be subject to judicial review. . . ."

[5] 47 U. S. C. § 309:

"(a) Examination; action by Commission.

"If upon examination of any application provided for in section 308 of this title the Commission shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.

"(b) Notification of denial; contents; reply; hearing; intervention.

"If upon examination of any such application the Commission is unable to make the finding specified in subsection (a) of this section, it shall forthwith notify the applicant and other known parties in interest of the grounds and reasons for its inability to make such

Respondent also claimed:

"The Rules, in considering the ownership of one (1%) per cent or more of the voting stock of a broadcast licensee corporation as equivalent to ownership, operation or control of the station, are unreasonable and bear no rational relationship to the national Anti-Trust policy." .

This latter claim was important to respondent because allegedly 20% of its voting stock was in scattered ownership and was traded in by licensed dealers. This stock was thus beyond its control.

Respondent asserted it was a "party aggrieved" and a "person suffering legal wrong" or adversely affected under the several statutes that authorize review of FCC action. See notes 2, 3 and 4, *supra*. It stated its injuries from the Rules thus:

"Storer is adversely affected and aggrieved by the Order of the Commission adopted on November 25, 1953, amending the Multiple Ownership Rules, in that:

"(a) Storer is denied the right of a full and fair hearing to determine whether its ownership of an interest in more than seven (7) standard radio and five (5) television broadcast stations, in light of and upon a showing of all material circumstances, will

---

finding. . . . Following such notice, the applicant shall be given an opportunity to reply. If the Commission, after considering such reply, shall be unable to make the finding specified in subsection (a) of this section, it shall formally designate the application for hearing on the grounds or reasons then obtaining and shall notify the applicant . . . specifying with particularity the matters and things in issue . . . . Any hearing subsequently held upon such application shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate but in which both the burden of proceeding with the introduction of evidence upon any issue specified by the Commission, as well as the burden of proof upon all such issues, shall be upon the applicant."

thereby serve the public interest, convenience and necessity.

"(b) The acquisition of Storer's voting stock by the public under circumstances beyond the control of Storer, may and could be violative of the Multiple Ownership rules, as amended, and result in a forfeiture of licenses now held by Storer, with resultant loss and injury to Storer and to all other Storer stockholders."

On the day the amendments to the Rules were adopted, a pending application of Storer for an additional television station at Miami was dismissed on the basis of the Rules.

While the question of respondent's right to appeal has not been raised by either party or by the Court of Appeals, our jurisdiction is now mooted. It may be considered. *Federal Communications Comm'n* v. *National Broadcasting Co.,* 319 U. S. 239, 246. Jurisdiction depends upon standing to seek review and upon ripeness. If respondent could not rightfully seek review from the order adopting the challenged regulations, it must await action to its disadvantage under them, and neither the Court of Appeals nor this Court has jurisdiction of the controversy. Under the above-cited Code sections, review of Commission action is granted any party aggrieved or suffering legal wrong by that action.[6]

---

[6] Legal wrong, as a ground for standing to appeal, was introduced by the Administrative Procedure Act, § 10 (a). 60 Stat. 243. In explanation the reports of the Senate, No. 752, 79th Cong., 1st Sess. 26, and the House, No. 1980, 79th Cong., 2d Sess. 42, define "legal wrong":

"The phrase 'legal wrong' means such a wrong as is specified in section 10 (e). It means that something more than mere adverse personal effect must be shown in order to prevail—that is, that the adverse effect must be an illegal effect."

Section 10 (e) of the bill required reviewing courts to "hold unlawful any action . . . (3) contrary to statutes or statutory right." Section 10 (e) of the Act is now in substantially the same language. 5 U. S. C. § 1009 (e).

We think respondent had standing to sue at the time it exercised its privilege. The process of rulemaking was complete. It was final agency action, 5 U. S. C. § 1001 (c) and (g), by which Storer claimed to be "aggrieved." When the authority to appeal was substantially the same, we held that an appellant who complained of the grant of a license to a competitor because it would reduce its own income had standing to appeal against a contention, admittedly sound, that such economic injury to appellant was not a proper issue before the Commission. We said:

> "Congress had some purpose in enacting § 402 (b)(2). It may have been of opinion that one likely to be financially injured by the issue of a license would be the only person having a sufficient interest to bring to the attention of the appellate court errors of law in the action of the Commission in granting the license. It is within the power of Congress to confer such standing to prosecute an appeal." *Federal Communications Comm'n* v. *Sanders Radio Station,* 309 U. S. 470, 477.

We added that such an appellant could raise any relevant question of law in respect to the order.

Again in *Columbia Broadcasting System* v. *United States,* 316 U. S. 407, this Court considered the problem of standing to review Commission action under the then existing § 402 (a), 48 Stat. 1093, and the Urgent Deficiencies Act, 38 Stat. 219. CBS there sought review of the adoption of Chain Broadcasting Regulations by the Commission. Against the contention that the adoption of regulations did not command CBS to do or refrain from doing anything (dissent 316 U. S., at 429), this Court held that the order promulgating regulations was

reviewable because it presently affected existing contractual relationships. It said:

"The regulations are not any the less reviewable because their promulgation did not operate of their own force to deny or cancel a license. It is enough that failure to comply with them penalizes licensees, and appellant, with whom they contract. If an administrative order has that effect it is reviewable and it does not cease to be so merely because it is not certain whether the Commission will institute proceedings to enforce the penalty incurred under its regulations for noncompliance." *Id.*, at 417–418.

The Court said that the regulations "presently determine rights." *Id.*, at 421.

"Appellant's standing to maintain the present suit in equity is unaffected by the fact that the regulations are not directed to appellant and do not in terms compel action by it or impose penalties upon it because of its action or failure to act. It is enough that, by setting the controlling standards for the Commission's action, the regulations purport to operate to alter and affect adversely appellant's contractual rights and business relations with station owners whose applications for licenses the regulations will cause to be rejected and whose licenses the regulations may cause to be revoked." *Id.*, at 422.

See *Federal Communications Comm'n* v. *American Broadcasting Co.*, 347 U. S. 284, 289, and *El Dorado Oil Works* v. *United States,* 328 U. S. 12, 18–19.

The regulations here under consideration presently aggrieve the respondent. The Commission exercised a power of rulemaking which controls broadcasters. The Rules now operate to control the business affairs of Storer. Unless it obtains a modification of this declared adminis-

trative policy, Storer cannot enlarge the number of its standard or FM stations. It seems, too, that the note to Rule 3.636 (n. 1, *supra*) endangers Storer's stations as alleged in its petition for review. See this opinion, *supra*, p. 197, at (b). Commission hearings are affected now by the Rules. Storer cannot cogently plan its present or future operations.[7] It cannot plan to enlarge the number of its standard or FM stations, and at any moment the purchase of Storer's voting stock by some member of the public could endanger its existing structure. These are grievances presently restricting Storer's operations. In the light of the legislation allowing review of the Commission's actions, we hold that Storer has standing to bring this action.

In its petition for review Storer prayed the court to vacate the provisions of the Multiple Ownership Rules insofar as they denied to an applicant already controlling the allowable number of stations a "full and fair hearing" to determine whether additional licenses to the applicant would be in the public interest.[8] The Court of Appeals struck out, as contrary to § 309 (a) and (b) of the Communications Act (n. 5, *supra*), the words italicized in Rule 3.636 (n. 1, *supra*) and the similar words in Rules 3.35 and 3.240. The case was remanded to the Commission with directions to eliminate these words. 95 U. S. App. D. C. 97, 220 F. 2d 204. We granted certiorari. 350 U. S. 816.

---

[7] Cf. *Frozen Food Express* v. *United States*, 351 U. S. 40, 43–44.

[8] Storer also attacked the 1% ownership provision that appears as a note to Rule 3.636, n. 1, *supra*. This was not passed upon by the Court of Appeals. 95 U. S. App. D. C. 97, 220 F. 2d 204. Its judgment leaves that portion of the Rule unaffected. As there was no cross petition for certiorari, we leave open the question of its validity.

The Commission asserts that its power to make regulations gives it the authority to limit concentration of stations under a single control.[9]   It argues that rules may go beyond the technical aspects of radio, that rules may validly give concreteness to a standard of public interest, and that the right to a hearing does not exist where an applicant admittedly does not meet those standards as there would be no facts to ascertain.   The Commission shows that its regulations permit applicants to seek amendments and waivers of or exceptions to its Rules.[10] It adds:

> "This does not mean, of course, that the mere filing of an application for a waiver . . . would necessarily require the holding of a hearing, for if that were the case a rule would no longer be a rule.   It means

---

[9] "The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions." 47 U. S. C. § 154 (i).

"Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall—

. . . . .

"(f) Make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this chapter: . . . .

. . . . .

"(r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, . . . ." 47 U. S. C. § 303.

[10] 47 CFR, Rev. 1953, § 1.361 (c):

"(c) Applications which, because of the nature of the particular rule, regulation, or requirement involved, are patently not in accordance with the Commission's rules, regulations, or other requirements will be considered defective and will be dismissed unless accompanied by a request of the applicant for waiver of, or exception to, any rule,

only that it might be an abuse of discretion to fail to hear a request for a waiver which showed, on its face, the existence of circumstances making application of the rule inappropriate."

Respondent defends the position of the Court of Appeals. It urges that an application cannot be rejected under 47 U. S. C. § 309 without a "full hearing" to applicant. We agree that a "full hearing" under § 309 means that every party shall have the right to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. Cf. 5 U. S. C. § 1006 (c). Such a hearing is essential for wise and just application of the authority of administrative boards and agencies.

We do not read the hearing requirement, however, as withdrawing from the power of the Commission the rule-making authority necessary for the orderly conduct of its business. As conceded by Storer, "Section 309 (b) does not require the Commission to hold a hearing before denying a license to operate a station in ways contrary to those that the Congress has determined are in the public interest." [11] The challenged Rules contain limi-

regulation, or requirement with which the application is in conflict. Such requests shall show the nature of the waiver or exception desired and set forth the reasons in support thereof."

Section 1.702:

"*Petition for amendment or waiver of rules.* Any interested person may petition for issuance, amendment, repeal or waiver of any rule or regulation. Such petition shall show the text of the proposed rule, or its change, and set forth the reason in support of the petition."

See also 47 CFR, 1941 Supp., §§ 1.72, 1.81.

[11] See 47 U. S. C. §§ 310 and 311. Cf. *Ashbacker Radio Corp.* v. *Federal Communications Comm'n*, 326 U. S. 327, 333, n. 9; and 47

tations against licensing not specifically authorized by statute. But that is not the limit of the Commission's rulemaking authority. 47 U. S. C. § 154 (i) and § 303 (r) grant general rulemaking power not inconsistent with the Act or law.

This Commission, like other agencies, deals with the public interest. *Scripps-Howard Radio* v. *Federal Communications Comm'n*, 316 U. S. 4, 14. Its authority covers new and rapidly developing fields. Congress sought to create regulation for public protection with careful provision to assure fair opportunity for open competition in the use of broadcasting facilities. Accordingly, we cannot interpret § 309 (b) as barring rules that declare a present intent to limit the number of stations consistent with a permissible "concentration of control." It is but a rule that announces the Commission's attitude on public protection against such concentration.[12] The Communications Act must be read as a whole and with appreciation of the responsibilities of the body charged with its fair and efficient operation. The growing complexity of our economy induced the Congress to place regulation of businesses like communication in specialized agencies with broad powers. Courts are slow to interfere with their conclusions when reconcilable with statutory directions.[13] We think the Multiple Ownership Rules, as adopted, are reconcilable with the Com-

---

CFR, Rev. 1953, § 1.724; *Felman* v. *United States,* 339 U. S. 973; *Federal Communications Comm'n* v. *American Broadcasting Co.,* 347 U. S. 284.

[12] See *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 196. We said last Term that determination of improper concentration of control was for appraisal by the Commission after hearing. *Federal Communications Comm'n* v. *Allentown Broadcasting Co.,* 349 U. S. 358, 363–364.

[13] See *Unemployment Comm'n* v. *Aragon,* 329 U. S. 143, 153; *O'Leary* v. *Brown-Pacific-Maxon,* 340 U. S. 504, 508.

munications Act as a whole. An applicant files his application with knowledge of the Commission's attitude toward concentration of control.

In *National Broadcasting Co.* v. *United States,* 319 U. S. 190, similar rules prohibiting certain methods of chain broadcasting were upheld despite a claim that the Rules caused licenses to be denied without "examination of written applications presented . . . as required by §§ 308 and 309." *Id.,* at 230.[14] The *National Broadcasting* case validated numerous regulations couched in the prohibitory language of the present regulations. The one in the margin will serve as an example.[15]

In the *National Broadcasting* case we called attention to the necessity for flexibility in the Rules there involved.

---

[14] Point III of the National Broadcasting Company brief argued the matter under this heading, "The Commission Cannot Escape Its Duty to Evaluate and Decide Each License Application on Its Own Facts." At that time § 309 (a) had the hearing provision. It read:

"Sec. 309. (a) If upon examination of any application for a station license or for the renewal or modification of a station license the Commission shall determine that public interest, convenience, or necessity would be served by the granting thereof, it shall authorize the issuance, renewal, or modification thereof in accordance with said finding. In the event the Commission upon examination of any such application does not reach such decision with respect thereto, it shall notify the applicant thereof, shall fix and give notice of a time and place for hearing thereon, and shall afford such applicant an opportunity to be heard under such rules and regulations as it may prescribe." 48 Stat. 1085.

Change to the present form was merely for more certainty and clarification to avoid the possibility of arbitrary Commission action. See S. Rep. No. 44, 82d Cong., 1st Sess. 8.

[15] "No license shall be granted to a standard broadcast station having any contract, arrangement, or understanding, express or implied, with a network organization under which the station is prevented or hindered from, or penalized for, broadcasting the programs of any other network organization." *Id.,* at 200; 47 CFR, 1941 Supp., § 3.101.

The "Commission provided that 'networks will be given full opportunity, on proper application for new facilities or renewal of existing licenses, to call to our attention any reasons why the principle should be modified or held inapplicable.' "  *Id.,* at 207.  We said:

> "The Commission therefore did not bind itself inflexibly to the licensing policies expressed in the Regulations.  In each case that comes before it the Commission must still exercise an ultimate judgment whether the grant of a license would serve the 'public interest, convenience, or necessity.'  If time and changing circumstances reveal that the 'public interest' is not served by application of the Regulations, it must be assumed that the Commission will act in accordance with its statutory obligations."  *Id.,* at 225.

That flexibility is here under the present § 309 (a) and (b) and the FCC's regulations.  See n. 10, *supra.*  We read the Act and Regulations as providing a "full hearing" for applicants who have reached the existing limit of stations, upon their presentation of applications conforming to Rules 1.361 (c) and 1.702, that set out adequate reasons why the Rules should be waived or amended.  The Act, considered as a whole, requires no more.  We agree with the contention of the Commission that a full hearing, such as is required by § 309 (b), n. 5, *supra,* would not be necessary on all such applications. As the Commission has promulgated its Rules after extensive administrative hearings, it is necessary for the accompanying papers to set forth reasons, sufficient if true, to justify a change or waiver of the Rules.  We do not think Congress intended the Commission to waste time on applications that do not state a valid basis for a hearing.  If any applicant is aggrieved by a refusal, the way for review is open.

We reverse the judgment of the Court of Appeals and remand the case to that court so that it may consider respondent's other objections to the Multiple Ownership Rules.

*Reversed and remanded.*

MR. JUSTICE DOUGLAS concurs in the result.

MR. JUSTICE HARLAN, concurring in part and dissenting in part.

The Court has properly deemed it necessary to question *sua sponte* the jurisdiction of the Court of Appeals to entertain this case,[1] but I am unable to agree with its decision that such jurisdiction existed. In my view, Storer was not a "party aggrieved by a final order" of the Commission, within the meaning of 5 U. S. C. § 1034, and hence was not entitled to invoke the jurisdiction of the Court of Appeals. Accordingly, I would vacate the judgment below and remand the case to the Court of Appeals with directions to dismiss the petition for lack of jurisdiction.

---

[1] Although the question of reviewability was not raised below or argued here, there can be no doubt of the power of the Court to consider the issue *sua sponte,* since it goes to the jurisdiction of the Court of Appeals and of this Court. Cf. *Federal Communications Comm'n* v. *National Broadcasting Co.,* 319 U. S. 239, 246; *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 128, n. 3; *American Federation of Labor* v. *Labor Board,* 308 U. S. 401, 404. The jurisdiction of the Courts of Appeals to review orders of the Federal Communications Commission, other than those granting or denying licenses, is granted by the Act of December 29, 1950, 64 Stat. 1129, 5 U. S. C. §§ 1031–1042. Section 1032, which confers the jurisdiction, provides that "Such jurisdiction shall be invoked by the filing of a petition as provided in section 1034." Section 1034, in turn, provides that "Any party aggrieved by a final order . . . may, within sixty days after entry of such order, file in the court of appeals . . . a petition to review such order." In short, the court's jurisdiction may be invoked only upon the petition of a "party aggrieved by a final order."

1. These regulations do not, in my view, constitute an "order" within the meaning of § 1034. They simply establish certain standards to be followed by the Commission in the future exercise of its licensing powers; they do not require any licensee to do or to refrain from doing anything, attach no consequences to his action or inaction, and determine no questions as to his legal status. As such they are quite unlike the Chain Broadcasting regulations which were held to be a reviewable "order" in *Columbia Broadcasting System* v. *United States,* 316 U. S. 407, in a proceeding comparable to this one. Those regulations were held reviewable, not because every Commission action in the form of a regulation was considered to be an "order," but for the specific reason that they proscribed certain kinds of contracts between licensees and the national networks and, by prescribing the sanction of license cancellation for noncompliance, operated to coerce action by the licensees and to determine the legal status of the networks' contracts. Of their own force and with no further administrative action being taken, the regulations induced licensees to cancel existing network contracts and deterred them from entering into new ones. That coercive effect of the regulations on present conduct, the very characteristic which led the Court to regard the Chain Broadcasting regulations as an "order" despite their form, is totally lacking here.[2]

---

[2] Insofar as the Multiple Ownership regulations provide for the revocation of existing licenses upon the purchase by a licensee of a stock interest in more than the maximum number of stations, they could arguably be deemed an "order" forbidding licensees, under pain of license revocation, to engage in stock transactions the result of which would violate the numerical limitations. Storer is not complaining, however, of any such deterrent effect of the regulations and does not allege that it desires either to buy or to sell stock in any licensee. It objects only to the possibility of a future loss of a license should persons beyond its control—and, by hypothesis, *not* deterred by the regulations—purchase its stock. See paragraph (b) of Storer's allegations, p. 208, *infra.*

2. A second obstacle to review of the regulations here is that, even if they be deemed an "order," Storer has not shown that it is "aggrieved" by them.

In assessing the character of Storer's grievance, we must put aside the Commission's order, made simultaneously with its promulgation of the challenged regulations, which denied a pending application by Storer for a sixth television license. That order was reviewable only by a direct appeal within 30 days under 47 U. S. C. § 402 (b), (c), *Federal Communications Comm'n* v. *Columbia Broadcasting System,* 311 U. S. 132, and became final and conclusive upon Storer's failure to appeal from it. Since that order cannot be reviewed, and no relief from it may be granted in this proceeding, it is only of the prospective effect of the regulations, not their past application, that Storer may complain. And it is by that effect that Storer must show it is "aggrieved."

In its petition for review, Storer alleged that it was aggrieved by the regulations in that:

"(a) Storer is denied the right of a full and fair hearing to determine whether its ownership of an interest in more than seven (7) standard radio and five (5) television broadcast stations, in light of and upon a showing of all material circumstances, will thereby serve the public interest, convenience and necessity.

"(b) The acquisition of Storer's voting stock by the public under circumstances beyond the control of Storer, may and could be violative of the Multiple Ownership rules, as amended, and result in a forfeiture of licenses now held by Storer, with resultant loss and injury to Storer and to all other Storer stockholders."

However these allegations are read, they assert no more than that the Commission may in the future take action

pursuant to the regulations to deny or revoke a license. Of course, if such action should ever be taken, Storer would then be "aggrieved." But by the same token it would then have a complete remedy through a direct appeal from such action under § 402 (b). Until such time as the regulations are applied to it, however, Storer will not have been "aggrieved" and hence will not be entitled to review. Indeed, in this case we do not even reach the often difficult problem whether an alleged injury is sufficient or of such a nature as to entitle the complaining party to review; here we have that rare case in which no present injury of any kind is even alleged.

It is said, however, that the regulations "now operate to control the business affairs of Storer," despite the absence of any such allegation by Storer. Since the regulations do not have any coercive effect, I take that to mean only that Storer, if it exercises prudent business judgment, will take into account the announced policy of the Commission in deciding whether or not to apply for an additional license. No doubt that is true, but I fail to see how Storer has been "aggrieved" by being told in advance one of the factors that will govern the disposition of any future license application on its part. If anything, Storer is now able to make a more enlightened judgment as to the probabilities of success in obtaining a further license.

3. So clear is it, in fact, that Storer has not been "aggrieved" by the mere issuance of the regulations, that the Court's grant of review in this case must be premised not upon the effect of the regulations themselves, but simply upon Storer's interest in knowing whether or not a future application of them would be valid. The result is that the statutory procedure for obtaining relief from a present injury caused by an order has been converted into something quite different—namely, a procedure for obtaining a declaratory judgment as to the validity of a

future application of new regulations. Not only is such a proceeding not authorized by the statute, however, but Storer would not have standing to invoke it even if it were.

That declaratory relief from future orders is not contemplated by § 1034 seems clear. That section authorizes review only of an "order," only if the order is "final," and only at the instance of one aggrieved "by" the challenged order itself. The regulations here are not an "order"; if they were it would not be "final" since further administrative action must be taken before Storer will be affected; and Storer's grievance, if any, will be caused not "by" the regulations but only by their future application. Moreover, quite apart from these obstacles, the procedure provided for by § 1034 is inappropriate for anticipatory equitable relief. That section requires, for example, that petitions for review be filed within 60 days after the order is issued. While such a time limitation is clearly appropriate to a procedure for relief from an injury already suffered, there seems no justification for so limiting the availability of declaratory relief from future action. Why should declaratory relief be denied as the threat of the future injury becomes more imminent, or be granted to those who have a sufficient interest to seek review immediately while being denied to those who later acquire a similar or even greater interest? Finally, no reason is apparent why existing procedures for declaratory judgments are not adequate; to construe § 1034 as an alternative declaratory judgment procedure simply produces the incongruous result of authorizing declaratory relief in the Courts of Appeals within 60 days after the order is issued and in the District Courts thereafter.

In the second place, even if § 1034 is to be construed as authorizing declaratory relief, I see no reason why the usual requirements for invoking equity jurisdiction should not be as applicable to such a proceeding as they are to

an ordinary declaratory judgment action or to a proceeding to set aside a Commission order under the Urgent Deficiencies Act, the predecessor to § 1034 under which the *CBS* case arose. In that case, CBS's right to equitable relief in advance of the application of the regulations was expressly based on the irreparable injury it would suffer—the wholesale cancellation of its contracts with licensees—before any further administrative action was taken and for which there was no other adequate remedy. Unless these requirements for equitable relief are to be abandoned, there can be no right to relief here, for Storer alleges no threatened injury of any kind, other than the possibility of future administrative action for which there would be a complete remedy by appeal.

It is said, however—again without support of any allegations by Storer—that Storer "cannot cogently plan its present or future operations" unless it is advised whether or not the regulations are valid. But plans for expansion of communications facilities have always had to be made subject to the contingency that the Commission might refuse to grant the necessary license for any one of a number of reasons. Storer's position in this respect is now no different than it was before the regulations were issued: any plan to acquire a new station must simply take into account, among the several contingencies, the likelihood that a denial of a license under the regulations would be upheld on appeal. What this argument comes down to, therefore, is that Storer needs to know whether or not it can validly be denied a license under the regulations so that, if it can, it need not make an application. That is, the injury that Storer will have suffered if the decision on the validity of the regulations is postponed until Storer in fact applies for a license is the expense of making that very application, the same injury that is suffered by all unsuccessful license applicants. Until today, I should not have thought argument was necessary to reject such

a basis for declaratory relief. Declaratory relief has been denied persons whose only alternative was to risk both dismissal from public employment and the imposition of criminal penalties, *United Public Workers* v. *Mitchell,* 330 U. S. 75, yet it is granted here to relieve Storer of the mere burden of making an application for a license.[3]

4. The holding of the Court today amounts to this: that regulations which impose no duty and determine no rights may be reviewed at the instance of a person who alleges no injury, to settle whether a future application of the regulations that may never occur would be valid. The lack of support for this decision is disclosed by the Court's primary reliance on *CBS*,[4] a case which in my view not only fails to support the Court's conclusion but is persuasive, if not controlling, authority for precisely the opposite result.[5] In my opinion, the implications of the

[3] The recent holding of this Court in *East Texas Motor Freight Lines, Inc.* v. *Frozen Food Express, ante,* p. 49, does not support the result reached here. In that case the declaratory interpretation of the Interstate Commerce Act—sought by way of review of the Commission's interpretative regulations in a proceeding under the Urgent Deficiencies Act—was considered justified because of the possibility of criminal penalties being imposed for violations of the Act and the risk of loss of substantial investments in operations that might subsequently be enjoined by the Commission. No such necessity for declaratory relief is even alleged here; there is no threat of criminal prosecutions and, since a license is always a condition precedent to acquisition of a new station, there is no danger of the loss of investments to be made prior to the future administrative action.

[4] Of the other cases cited by the Court, only *Federal Communications Comm'n* v. *American Broadcasting Co.,* 347 U. S. 284, involved a similar situation, and there the jurisdictional problem was neither raised by the parties nor noted by the Court.

[5] Throughout the opinion in the *CBS* case, the Court emphasized the exceptional circumstances which justified immediate review of the Chain Broadcasting regulations and distinguished them from regulations of the sort here involved. See, *e. g.,* 316 U. S., at 424–425:

"We need not stop to discuss here the great variety of administrative rulings which, unlike this one, are not reviewable—either because

decision undermine much of the settled law on review-
ability of administrative action, and it is the more
unfortunate because made without the benefit of briefs
or argument by the parties. I cannot concur in that
part of the Court's opinion.

The Court having decided, however, that the Court of
Appeals had jurisdiction, I concur with the Court on the
merits.

MR. JUSTICE FRANKFURTER, dissenting.

While I agree that the amendatory Rules promulgated
by the Federal Communications Commission relating to
Multiple Ownership of standard, FM and television sta-
tions constitute a reviewable "order" within the meaning
of 5 U. S. C. § 1034, my Brother HARLAN's reasoning con-
vinces me that the respondent was not on the record
before us a "party aggrieved" under that section. There-
fore the court below should not have entertained the
petition to review the Commission's order.

Procedural and jurisdictional limitations on judicial
action by the federal courts are not playthings of lawyers
nor obstructions on the road of justice. Whether formu-
lated by the Constitution, congressional enactments or
settled judicial precedents, they are means designed to
keep the courts within appropriate limits and to enforce

they do not adjudicate rights or declare them legislatively, or because
there are adequate administrative remedies which must be pursued
before resorting to judicial remedies, or because there is no occasion
to resort to equitable remedies. But we should not for that reason
fail to discriminate between them and this case in which, because
of its peculiar circumstances, all the elements prerequisite to judicial
review are present. The ultimate test of reviewability is not to be
found in an overrefined technique, but in the need of the review to
protect from the irreparable injury threatened in the exceptional case
by administrative rulings which attach legal consequences to action
taken in advance of other hearings and adjudications that may follow,
the results of which the regulations purport to control."

rights according to general standards and not have them depend on the impact of the individual case. To be sure, dealing as we are with general standards, differences of views regarding their scope and applicability are bound to arise from time to time. Who is a "party aggrieved" or a "party in interest" turns on the context, often con-fused and dubious, of a particular set of circumstances and therefore raises issues on which judges not unnaturally divide, as they do on other unmathematical problems of the law. See *Singer & Sons* v. *Union Pacific R. Co.,* 311 U. S. 295.

To the laity such matters may seem technicalities in a derogatory sense of the term. But this is only one phase of an attitude of mind that thinks ill of law which does not accord with private wishes. When informed by a legal adviser that to carry out his desires would encounter "technical legal difficulties," a strenuous President of the United States impatiently observed that "all law is technicality." But even professionally competent officials are at times impatient with decisions that fail to adjudicate substantive issues on which light is sought. It seems to me important, therefore, not to minimize the function of jurisdictional limitations upon adjudication by expressing views on the merits. There are, of course, exceptional situations where it is proper for a dissenter to go to the merits when a majority of the Court removes from the case threshold objections of procedure and jurisdiction. See, *e. g., Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 341. This is not such a case.