**CLARK & REID COMPANY, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

**No. 76–1136.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 28, 1977.

Decided Sept. 19, 1977.

---

James F. Flint, Washington, D. C., with whom Charles Ephraim, Washington, D. C., was on the brief, for petitioner.

Alan J. Thiemann, Atty., I. C. C., Washington, D. C., with whom Arthur J. Cerra, Gen. Counsel, I. C. C., Charles H. White, Jr., Assoc. Gen. Counsel, I. C. C. and Lloyd John Osborn, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondents. Raymond Michael Ripple and Carl E. Howe, Jr., Attys., I. C. C., Washington, D. C., also entered appearances for respondent I. C. C.

Before TAMM, ROBINSON and ROBB, Circuit Judges.

Opinion per curiam.

PER CURIAM:

Petitioner, Clark & Reid Company, Inc., a motor common carrier, filed two "gateway elimination"[1] applications with the Interstate Commerce Commission. With exceptions not pertinent here,[2] both applications had as their goal the same direct operating authority, but each took a different procedural course. The Commission granted one of the applications, which sought what is known as "letter-notice" authority.[3] That

---

1. Until 1974, motor carriers could combine two certificates of public convenience and necessity that shared a common terminus in order to provide through service between the non-common points via the common terminus, which is known as a "gateway." In *Motor Common Carriers of Property, Routes and Service*, 116 M.C.C. 530 (1974), the Commission promulgated rules, now codified as 49 C.F.R. § 1065 (1975), forbidding "tacking" of certificates save in limited circumstances. 49 C.F.R. § 1065.1(b) (1975). When tacking was thus prohibited, such through service as had theretofore been provided by tacking could be continued only by qualifying for "gateway elimination" authority, which would, as the name implies, relieve the carrier of the necessity of moving through the gateway and thereby allow it to travel the more direct route. See generally *Chem-Haulers, Inc. v. United States*, 184 U.S.App.D.C. ——, 565 F.2d 728 (1977); *Thompson Van Lines, Inc. v. United States*, 399 F.Supp. 1131 (D.D.C.1975), aff'd, 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976); O'Neill, *The Implementation of Complex, Remedial Regulations: The ICC Gateway Elimination Policy*, 43 I.C.C. Prac.J. 601 (1976).

2. Petitioner did ask for more, but it was denied, and it apparently has abandoned those claims.

3. 49 C.F.R. § 1065.1(d)(1) (1975) provides in pertinent part:

A carrier seeking to eliminate gateways pursuant to paragraph (a) [see note 4 *infra* and accompanying text] shall be required to adhere to the following procedures:

(i) File a letter . . . with this Commission . . ., describing the gateways to be eliminated . . ., and attaching . . . (A) copies of appropriate tariff provisions establishing that such through services were offered by the carrier on November 23, 1973. . . .

(ii) Allow fifteen days from the date of publication in the FEDERAL REGISTER of a notice of the carrier's intention to eliminate its gateways and for Commission review of the letter submission. . . . if the carrier is not otherwise informed by the Commission, operations may commence at the termination of the said 15-day period. This Commission reserves the right to require that a carrier terminate these operations if it should later be discovered that the carrier's operations do not qualify for the benefits of this rule.

(iii) Letter submissions under this rule will not be accepted after June 4, 1974, except [for one circumstance not here relevant].

type of authority is available merely upon a showing that the "most direct highway distance between the points to be served is not less than 80 percent of the highway distance between such points over the carrier's authorized routing through the gateway."[4]

The other application was made on a form designated OP–OR–9.[5] The Commission's rules contemplate that OP–OR–9 filings will be made only for gateway eliminations on routes that do not qualify under the 80-percent rule,[6] and that they are to be put to the more rigorous *Childress* test.[7] And while the rules recite that the Commission reserves "the right to require that a carrier terminate operations" under its letter-notice authority if it is later discovered that the superseded operations through the gateway did not in fact meet the 80-percent rule,[8] the Commission implicitly recognizes that applications satisfying the *Childress* standard do not stand in similar jeopardy, as they in no way depend on compliance with the 80-percent rule.[9] Finding that petitioner's OP–OR–9 application fell short of *Childress'* prerequisites,[10] the Commission took the position that letter-notice authority, with the drawback mentioned, was all that petitioner deserved, and denied the OP–OR–9 application in its entirety.[11]

■ Petitioner does not contest the Commission's conclusion that its OP–OR–9 application did not survive *Childress'* demands. It does claim that the Commission had earlier granted OP–OR–9 applications that demonstrated no more than compliance with the 80-percent rule,[12] and asserts that such treatment is inconsistent with that which it received. This position presupposes that while the Commission regards authority predicated solely on such a showing as susceptible to "collateral attack" if obtained by letter-notice,[13] the agency deems it impregnable if obtained by OP–OR–9 application. That view would seem quite arbitrary, and absent demonstration we would be unwilling to attribute to the Commission so peculiar an exaltation of form over substance. As very shortly it will develop, however, the Commission's view on the relative vulnerability of its grants of operating authority hardly leaves room for the distinction that petitioner en-

**4.** 49 C.F.R. § 1065.1(a)(3) (1975). See also 49 C.F.R. § 1065.1(d)(1)(i) (1975), set out in part *supra* note 3.

**5.** Joint Appendix (J.App.) 1.

**6.** 49 C.F.R. § 1065.1(d)(2) (1975).

**7.** *Childress—Elimination of Sanford Gateway,* 6 M.C.C. 421, 428 (1952), as incorporated in the Commission's gateway elimination rules in *Motor Common Carriers of Property, Routes and Service, supra* note 1, 116 M.C.C. at 536. In a nutshell, the *Childress* standard requires a carrier to prove that it had transported enough traffic through the gateway to indicate that it was vital to the existing competitive balance on the through route, and that elimination of the gateway would not derange that balance. See generally *Chem-Haulers, Inc. v. United States, supra* note 1, and cases therein cited.

**8.** 49 C.F.R. § 1065.1(d)(1)(ii) (1975), set out in note 3 *supra*.

**9.** See note 7 *supra*.

**10.** *Clark & Reid Co., Inc., Extension—Gateway Elimination,* No. MC–34485 (Sub–No. 2G), (Div. 1 as appellate division, order of Feb. 2, 1976) (unreported), J.App. 44. The Review Board, to which petitioner's OP–OR–9 application was presented, had denied it in its entirety because it "duplicate[d] . . . letter-notices [petitioner] has filed; [and] no necessity is shown to grant [petitioner] authority herein which would duplicate that sought by letter-notices. . . ." *Id.* (order of July 24, 1975) (unreported), J.App. 25. Division 1 of the Commission initially affirmed the Board, *id.* (order of Dec. 8, 1975) (unreported), J.App. 34. In its petition for reconsideration, however, petitioner called attention to the greater possibility of attack on letter-notice authority than on OP–OR–9 authority, which prompted the division to reexamine the application in light of the *Childress* standard. As we have noted, it was found wanting.

**11.** *Id.* (order of Feb. 2, 1976), J.App. 44.

**12.** Petitioner cites several unreported decisions of the Commission to this effect. Brief for Petitioner App. D. The Commission does not dispute that it has granted "80 percent authority" though filed on an OP–OR–9 form. Brief for Respondent at 20–23.

**13.** See notes 8–12 *supra* and accompanying text.

**736**

deavors to draw.[14] Accordingly, we reject petitioner's first contention.

Petitioner further argues that insofar as its letter-notice authority is prey to revocation if the Commission later finds that its prior operations through gateways violated the 80-percent rule,[15] it does attain the stature of authority conferred by a certificate of public convenience and necessity. Petitioner urges that the authority which it secured in its gateway elimination proceeding ought to rise to that stature. Commission counsel represents to us that letter-notice authority is commensurate with authority granted by a certificate of public convenience and necessity, but takes the position that noncompliance with the 80-percent rule is a debility of the sort that would support revocation of a certificate as well as a letter-notice.[16] Since the Commission has heretofore made no other distinction between the two kinds of operating rights,[17] this definitional jousting boils down to the question whether the Commission really has power to revoke letter-notice authority—as by regulation it purports to reserve[18] —upon a later finding that the operations through the gateway violated the 80-percent rule.

■ For obvious reasons, petitioner declines to force this issue by alleging that any of its letter-notice authority has actually run afoul of the 80-percent rule, and the Commission has evinced no intent to require termination of any of petitioner's operations on that ground. Nor does it appear that uncertainty over the permanence of petitioner's letter-notice authority presently casts any pall over its day-to-day operations. All that we can fairly say is that at

the moment petitioner's letter-notice authority stands in no more jeopardy than any other authority predicated exclusively upon satisfaction of the 80-percent rule. Thus the validity and legal effect of the Commission's reservation of a purported right to revoke[19] are questions not properly before us at this juncture, and it will be time enough to address them if and when the Commission undertakes to invoke that power. As no showing is made that petitioner has, at least as yet, received any disparate treatment, the Commission's order under review is

*Affirmed.*

---

14. See text *infra* at note 16.

15. See notes 8–12 *supra* and accompanying text.

16. Joint Brief for Appellees at 25–26, citing *American Trucking Ass'ns v. Frisco Co.,* 358 U.S. 133, 144–145, 79 S.Ct. 170, 177, 3 L.Ed.2d 172, 180–181 (1958) (Commission has the power to modify certificates issued due to inadvertence).

17. It is noteworthy in this regard that the regulations underlying the letter-notice format were characterized by the Commission as "general

rule[s] of construction applicable to the outstanding certificates of the carriers," *Motor Common Carriers of Property, Routes and Services, supra* note 1, 116 M.C.C. at 535, and were justified by the public convenience and necessity. *Id.* at 535–536.

18. See notes 8–12 *supra* and accompanying text.

19. See notes 8–12 *supra* and accompanying text.